**KELLEY DRYE & WARREN LLP**
Michael J. Zinna (Admitted *Pro Hac Vice*)
John F. Ward (Admitted *Pro Hac Vice*)
David Lindenbaum (Admitted *Pro Hac Vice*)
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-7800
mzinna@kelleydrye.com
jward@kelleydrye.com
dlindenbaum@kelleydrye.com

**KELLEY DRYE & WARREN LLP**
Andrew W. Homer (State Bar No. 259852)
Tahir L. Boykins (State Bar No. 323441)
10100 Santa Monica Boulevard, 23rd Floor
Los Angeles, CA 90067-4008
Telephone: (310) 712-6100
Facsimile: (310) 712-6199
ahomer@kelleydyre.com
tboykins@kelleydrye.com

Attorneys for Plaintiff ZOMM, LLC

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZOMM, LLC<br><br>      Plaintiff,<br><br>      v.<br><br>APPLE INC.,<br><br>      Defendant. | CASE NO. : 4:18-CV-04969-HSG<br><br>[Assigned to Hon. Haywood S. Gilliam, Jr.]<br><br>**SECOND AMENDED COMPLAINT**<br><br>Demand Jury Trial |

## SECOND AMENDED COMPLAINT

Plaintiff Zomm, LLC ("Zomm"), for its complaint against Apple Inc. ("Apple") alleges as follows:

## THE PARTIES

1. Plaintiff Zomm is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 8620 South Peoria Avenue, Tulsa, Oklahoma, 74132.

2. Upon information and belief, Defendant Apple is a California corporation organized under the laws of the State of California, with its principal place of business at 1 Apple Park Way, Cupertino, California 95014.

## NATURE OF THE ACTION

3. This is an action for patent infringement of U.S. Pat. No. 8,351,895 ("the '895 Patent") in violation of the United States patent laws, 35 U.S.C. § 100, *et seq*., and for breach of contract under the laws of the State of California.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over the patent claim pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5. This Court has subject matter jurisdiction over the breach of contract claim under 28 U.S.C. § 1367(a) (supplemental jurisdiction) because this claim is so related to the patent claim that they form part of the same case or controversy.

6. This Court also has diversity jurisdiction over this action because Zomm and Apple are citizens of different states and the amount in controversy is over $75,000.

7. This Court has personal jurisdiction over Apple at least because Apple is a California corporation and has its principal place of business in Cupertino, California.

8. Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b), 1391 (c) and 1400(b).

/ / /

## **FACTUAL BACKGROUND**

### **The Parties and their Relationship**

9.     Founded in 2009, Zomm is a global technology and consumer products company focused on mobile safety and security, with the mantra of "enhancing lives through technology." The company has and has had offices in Tulsa, Oklahoma, Kirkland, Washington, the United Kingdom, Hong Kong, Germany and Austria.

10.     Zomm has obtained 15 patents, in the United States, the European Community, Japan, Hong Kong and China.

11.     Zomm's products are offered for sale through the company's website, www.zomm.com, and through Amazon.com, and Walmart.com. Zomm's products have also been offered for sale at Best Buy, QVC, multiple other wholesale and retail outlets, and as discussed in more detail below, Apple's brick-and-mortar and online retail outlets.

12.     Zomm's first product was called the Wireless Leash.  Development of the Wireless Leash began in early 2009, when Zomm President and Co-Founder Laurie Penix received a call from a friend who needed an extra mobile phone because her husband had lost his phone.  Ms. Penix had just finished reading an article about Bluetooth technology, and this combination of circumstances sparked her idea for a product that could prevent users from misplacing their mobile phones while also serving as a security device.

13.     The Wireless Leash met with immediate critical praise.  The product launched in January, 2010 and won the Best of Innovation Award at the world-renowned Consumer Electronics Show ("CES") that same month in Las Vegas.  The product was also one of only two finalists for the 2011 Bluetooth SIG "Best of CES" Award.

14.     In the wake of the acclaim the Wireless Leash received at the 2010 CES Show, Zomm was contacted by Apple to explore the possibility of selling the product through Apple's brick-and-mortar retail stores and online channels.

15.     The original Wireless Leash worked with Apples' iPhones.  Nonetheless, Apple requested that Zomm create a version of the Wireless Leash that was designed specifically for

Apple's iOS operating systems installed on Apple devices. Apple designates devices designed specifically for Apple's iOS operating system to be "Made for iPhone/iPod/iPad" or MFi compliant. Companies that join the MFi program and pass certification tests are able to display certain MFi-related logos on their product packaging, like a "Made for iPod" badge. Zomm reallocated funds and revised its business plan so that it would have the funds necessary to accomplish this task.

16. Once Zomm was positioned to meet Apple's request, Zomm and Apple entered into a mutual confidentiality agreement, on or about July 29, 2010 (the "Confidentiality Agreement").

17. With the Confidentiality Agreement firmly in place, Zomm executives and engineers made several trips to Apple's headquarters in Cupertino, California, during which they shared details of what they were planning to develop for the iOS version of the Wireless Leash.

18. Over approximately five months, Zomm made modifications to the Wireless Leash product, including modifications to the source code (the "Zomm Source Code Modifications") to achieve MFi compliance. The Zomm Source Code Modifications included new algorithms and encryption code. The resultant product, including the Zomm Source Code Modifications, was introduced as the "Wireless Leash Plus" and was limited to sales within Apple retail channels, at the direction of Apple. During these meetings, Zomm executives also informed Apple personnel that they intended to create a watch, bracelet, and/or other wearables that would incorporate the features of the Wireless Leash.

19. The Zomm Source Code Modifications increased performance of the Wireless Leash Plus beyond the performance of the Wireless Leash. Neither the Zomm Source Code Modifications nor the benefits realized by the Zomm Source Code Modifications are disclosed in the '895 Patent. The Zomm Source Code Modifications also could not be gleaned from the internal components of the Wireless Leash Plus. The Zomm Source Code Modifications were maintained in secret by Zomm.

20. Zomm submitted to Apple the Zomm Source Code Modifications to confirm that

the Wireless Leash Plus was MFi compliant.  The Zomm Source Code Modifications were submitted to Apple in a form that could be copied by Apple, and in a form that allowed Apple to view the detailed programming of the Zomm Source Code Modifications.  Zomm relied on the Confidentiality Agreement to ensure that the Zomm Source Code Modifications were kept confidential.

21.     The lead engineer at Zomm who worked on the Zomm Source Code Modifications was Sam Kuhns.  As described further below, shortly after Mr. Kuhns completed the Zomm Source Code Modifications, Apple made an offer of employment to Mr. Kuhns and Mr. Kuhns accepted the offer.

22.     On or about November 2011, Zomm introduced the Wireless Leash Plus, now customized for use with Apple's iPhone, iPad and iPod.  The Wireless Leash Plus's features included a panic button that allowed users to sound an alarm with the press of a button, which was meant to deter potential attackers and notify others of distress.  Importantly, if a user held the button for approximately three seconds longer, the Wireless Leash Plus would dial local emergency assistance anywhere in the world the user was located, without the user having to touch his or her phone.  Notably, the title of Zomm's patent application that led to the '895 Patent, filed two years earlier (and published on March 10, 2011), is "Wireless Security Device and Method to Place Emergency Calls."

23.     Separately, Zomm also created an iPhone application that was designed to work with the Wireless Leash Plus and provide Apple customers with a customized user experience.

24.     Pursuant to Apple's request, on or about November 2011, the Wireless Leash Plus became available nationwide at brick-and-mortar Apple Stores and soon after, online at Apple's website, store.apple.com.  Several store locations sold out of the product quickly.  Distributor Ingram Micro Inc. (now part of HNA Group) informed Zomm that more units were needed. Zomm provided additional units to meet the sales demand.

25.     Just like the original version of the product, the Wireless Leash Plus was well received.  It was named an Apple staff "favorite pick" in December 2011.

4

26.     Selling exclusively through Apple was not particularly lucrative for Zomm.  Due to the distribution deal dictated by Apple, Zomm's profit on units of the Wireless Leash Plus—which could only be sold through Apple's retail channels—was very small.  In addition, restrictions preventing Zomm from selling the Wireless Leash Plus through retails channels other than Apple's retail channels inhibited Zomm's ability to turn the cache of having the product sold by Apple into revenue through sales in other channels.

27.     In 2012, Zomm showed a new product, Lifestyle Connect, at CES.  The product won three Innovation Awards at CES that year.  Lifestyle Connect was also geared towards the Emergency Dialing mobile safety product market and contained Zomm intellectual property.

28.     In or about November 2012, ten months after the Wireless Leash Plus was named an Apple Store staff favorite, Apple abruptly terminated its agreement to sell the Wireless Leash Plus through Apple's retail channels. The Wireless Leash Plus was completely removed from Apple's brick-and-mortar stores in or about November 2012 and was removed from Apple's online store shortly thereafter.

29.     Meanwhile, Apple was embarking on a plan to steal Zomm's patented technology for its own products. Beginning in December 2011 and continuing through November 2016, including when the Confidentiality Agreement was still in effect, Apple employees ordered numerous units of the Wireless Leash Plus directly from Zomm for Apple.  Zomm was subsequently informed by an Apple employee that these purchases were being made for research and development by Apple.  The Apple purchasers did not reveal that the orders were solely for Apple's commercial use at the time their orders were initially placed.

30.     On December 21, 2011, Zomm received an order from Apple employee Shayna Poor.  Upon information and belief, Ms. Poor was an executive assistant at Apple at the time. The order was to be delivered to Peter Handel, who, upon information and belief, at the time was an Apple Sr. Engineer/Scientist.  This order and a subsequent series of orders placed by Apple employees were not identified as corporate orders.

31.     On June 4, 2012, Christine Lee, at the time an Apple Engineering Test Program

Manager, ordered three Wireless Leash Plus units.

32.     Soon, the orders started getting larger.  On August 8, 2012, Natasha Burwell, at the time Executive Assistant to the Vice President of Wireless Technologies, iPhone HW, Product Design and Special Projects with Apple, ordered 11 units of the Wireless Leash Plus using a personal credit card.

33.     As noted above, in or about November 2012, Apple abruptly terminated its agreement to sell the Wireless Leash Plus through Apple's retail channels.

34.     On December 19, 2012, Zomm received an order from Cara Lomeli, at the time an Engineering Product Specialist with Apple, for 19 Wireless Leash Plus units.  The order was to be delivered to Jathurshun Sivaloganathan, who, upon information and belief, was at the time a Senior Manager with Apple.

35.     On January 09, 2013, one day after Zomm's '895 Patent, entitled "Wireless Security Device and Method to Place Emergency Calls" issued, Ms. Lomeli ordered five more units of the Wireless Leash Plus directly from Zomm.  On this order, the billing and shipping address matched the shipping address used for Mr. Sivaloganathan on Ms. Lomeli's previous order.

36.     On January 22, 2013 Ms. Lomeli ordered eight more units of the Wireless Leash Plus directly from Zomm.  On this order, the billing and shipping address matched the shipping address used for Mr. Sivaloganathan on Ms. Lomeli's first order.

37.     On February 12, 2013, Ms. Lomeli ordered another 21 units of the Wireless Leash Plus, directly from Zomm.  On this order, the shipping address matched the shipping address used for Mr. Sivaloganathan on Ms. Lomeli's previous three orders.  Ms. Lomeli had, by this point, ordered 53 units of the Wireless Leash Plus across four orders.

38.     On April 17, 2013, Lynnette Jenkins ordered 18 units of the Wireless Leash Plus directly from Zomm, to be delivered to her at an Apple corporate address.

39.     Each of the above-referenced orders were surreptitiously designed to appear as if they were for individual use, however, each order used a shipping address corresponding to a

location at Apple's business complex in Cupertino, California.  Given the suspicious purchases made by Apple employees and shipped to Apple addresses during the term of the Confidentiality Agreement, on April 17, 2013, Zomm called Apple for an explanation about the purpose of the orders.  Apple did not return the call, but the orders continued.

40.     Also during 2013, Apple hired Sam Kuhns, following his tenure with Zomm.

41.     Mr. Kuhns was one of Zomm's lead engineers and worked on Zomm's software and firmware for the Wireless Leash and Wireless Leash Plus, ultimately earning an award of appreciation from Zomm for his work.  As a result of these efforts, Mr. Kuhns had insights into Zomm's intellectual property and technology for the Wireless Leash and Wireless Leash Plus during his employment with Zomm.

42.     Following his employment with Zomm, Mr. Kuhns was restricted from revealing confidential details concerning Zomm's technology and intellectual property pursuant to his employment agreement and a separate non-disclosure agreement.

43.     Apple's orders continued.  On May 28, 2013, Ms. Jenkins placed two more orders for 17 units each of the Wireless Leash Plus using a credit card with her name on it.  On these orders, the billing and shipping address matched the shipping address used on Ms. Jenkins's April 17, 2013 order.  The order was not identified as a corporate order.  At this point, Ms. Jenkins had ordered 52 units of the Wireless Leash Plus, across three orders.

44.     On July 8, 2013, Natasha Burwell, at the time Executive Assistant to the Vice President of Wireless Technologies, iPhone HW, Product Design and Special Projects, placed an order for nine units of the Wireless Leash Plus to be delivered to Phil Carr, who at the time was a Lab Coordinator/OTA Technician at Apple at Apple's headquarters in Cupertino, CA.

45.     On July 16, 2013, Ritu Choudhary, at the time a Lead Program Manager for Special Programs with Apple, ordered 55 Wireless Leash Plus units and had the units delivered to an Apple business address in Cupertino, CA.

46.     On July 31, 2013, Amanda Simon, at the time employed by Apple as a Hardware Engineer Administrative Assistant, ordered one Wireless Leash Plus unit directly from Zomm

and had the unit delivered to an Apple business address in Cupertino, California.

47.     On December 30, 2013, Zomm CEO and co-founder, Henry Penix, contacted Cara Lomeli, inquiring about the reason that she placed the above-referenced orders. Mr. Penix stated that Zomm noticed a few orders of the Wireless Leash Plus being delivered to Apple at various times in 2012 and 2013, that Zomm had worked closely with Apple's technical team in the past, that the product Ms. Lomeli was ordering used to be offered in the Apple store, and that her orders had raised Zomm's curiosity.

48.     Apple did not respond to Mr. Penix's December 30, 2013 communication to Ms. Lomeli.

49.     On or about January 22, 2014, Mr. Penix contacted Cara Lomeli again, to inquire as to why Apple was placing these orders. Ms. Lomeli did not respond. Mr. Penix again called Ms. Lomeli approximately one month later. This time, Ms. Lomeli did return Mr. Penix's call. During that call, Ms. Lomeli informed Mr. Penix that the orders were being used for research and development. This troubling answer was really the only explanation that made sense, because any orders purchased by Apple for legitimate resale were required to go through a third party distribution/fulfillment company pursuant to an agreement between Zomm and Apple. The above-referenced purchases had to be for reasons other than resale to consumers, because they were ordered by Apple employees directly from Zomm and shipped to Apple addresses, specifically to the addresses of senior leaders, developers and scientists at Apple.

50.     On July 28, 2014, Mr. Penix emailed Apple CEO Tim Cook to inform him that Zomm had been awarded the '895 Patent for a wireless security device and method for placing emergency calls. Zomm's press release regarding the '895 Patent was attached. The email also noted that, "Zomm has not sold our products in Apple retail stores or online for a while, but have fulfilled a few orders to Apple corporate over the last 18 months."

51.     Mr. Cook did not respond to Mr. Penix's July 28, 2014 email.

52.     On August 19, 2014, Mr. Penix sent a follow-up email to Mr. Cook, forwarding his original email and the attached press release again, stating, "I wanted to ensure you received

my previous email about our product and IP." Apple executives Jonathan Ive (currently Apple's Chief Design Officer), Dan Riccio (currently Apple's Senior Vice President of Hardware Engineering) and Philip Schiller (currently Apple's Senior Vice President responsible for worldwide marketing) were copied on the email.

53. Mr. Cook did not respond to Mr. Penix's August 19, 2014 email, nor did anyone else from Apple.

54. On September 9, 2014, Apple announced its first iteration of the Apple Watch (the "Apple Watch Series 0"). The product included Bluetooth connectivity to an iPhone and the ability to talk into the device, two key features of the Wireless Leash Plus. The integration of these features into a watch and other wearable technology was an idea presented by Zomm in one if its early meetings with Apple under the Confidentiality Agreement. The Apple Watch's original operating system was watchOS 1. WatchOS 1 did not include an emergency contact feature.

55. Mr. Penix emailed Mr. Cook again on February 19, 2015, hoping that Zomm and Apple could still potentially work together, given Apple's clear interest in using the Wireless Leash Plus and its many features for development purposes. Mr. Cook did not respond to Mr. Penix's February 19, 2015 email.

56. The Apple Watch Series 0 was launched in or about April 2015.

57. On May 26, 2016, Mr. Penix emailed Mr. Cook again, asking to discuss the possibility of Apple and Zomm collaborating on the use of Zomm's technology in a watch or a device attached to a key ring.

58. Upon information and belief, Mr. Cook did not respond to Mr. Penix's May 26, 2016 email apparently because Apple planned to launch the Apple Watch that improperly used the features of Wireless Leash Plus, in direct contravention of the '895 Patent and in breach of the Confidentiality Agreement.

59. In or about June 2016, Apple held a public developer conference where Apple unveiled additional functionality that it planned to include in watchOS 3, which was a new

9

operating system for use with the Apple Watch. Among the new features in watchOS 3 was a feature called "Emergency SOS," an emergency function that calls an emergency number if a user presses and holds the Apple Watch's side button for a few seconds.

60.     Importantly, while 911 would be the appropriate emergency number in the United States, that is not the case in every country, so "Emergency SOS" was designed to call the correct emergency number for whatever country the user is in. The call routes through the user's iPhone, or directly from the Apple Watch if connected to Wi-Fi. After the emergency call, "Emergency SOS" can also alert emergency contacts the user has previously chosen, sending them information about the user's location.

61.     Apple stole the "Emergency SOS" feature from Zomm in breach of the Confidentiality Agreement and in violation of California common law. Incorporation of the "Emergency SOS" feature via watchOS 3 and 4 in the Apple Watch Series 0 and Apple Watch Series 1 also infringes the '895 Patent.

62.     The "Emergency SOS" feature was the subject of significant media attention. It became one of the stand-out features of watchOS 3. Some news articles about watchOS 3 were almost entirely devoted to this particular feature of the Apple Watch, barely mentioning other features such as smart home interconnectivity and expanded payment options.

63.     Apple continued to order the Wireless Leash Plus. On November 4, 2016, now approximately four years after Apple removed the Wireless Leash Plus from all of its retail channels, Alleen Aniciete who was employed by Apple as an administrative assistant, ordered three Wireless Leash Plus units and had them delivered directly to Apple's headquarters in Cupertino, California.

64.     Upon information and belief, when reporting Apple's earnings for the first fiscal quarter of 2017 (which included the 2016 holiday season – the first holiday season after watchOS 3 was released), Mr. Cook beamed that the Apple Watch set records in both units and revenue, and that "the holiday demand was so strong we couldn't make enough." See https://www.theverge.com/2017/2/7/14537584/apple-6-million-apple-watch-sales-estimates.

After luring Zomm into a relationship that had the promise of connecting two innovative companies working together to enhance lives through technology, Apple instead chose only to get close enough to Zomm to steal the company's technology. Apple breached the Confidentiality Agreement, and is actively and willfully infringing the '895 Patent.

**Zomm's '895 Patent and the Apple Watch**

65.     Zomm is the owner of all right, title, and interest in the '895 Patent entitled "Wireless Security Device and Method to Place Emergency Calls."

66.     The application leading to the '895 Patent was filed on September 4, 2009 and was assigned to Zomm prior to issuance of the '895 Patent.

67.     The '895 Patent was duly and properly issued by the United States Patent and Trademark Office on January 8, 2013.  A true and correct copy of the '895 Patent is attached hereto as Exhibit A.

68.     In or about April 2015, Apple began offering the Apple Watch Series 0 for sale.

69.     In or about September 2016, Apple began offering the Apple Watch Series 1 for sale.

70.     The Apple Watch Series 0 and Apple Watch Series 1, at least when running watchOS 3, watchOS 4, or watchOS 5 (the "Accused Devices"), are each a wireless security device comprising a processor, a wireless transceiver, a memory, and computer program instructions stored in the memory.

71.     According to an Apple Online Support Page, "To set up and use your Apple Watch, you need an iPhone 5 or later with the latest version of iOS." https://support.apple.com/en-us/HT204505

72.     The Accused Devices may each be paired to an Apple iPhone according to a Bluetooth wireless protocol profile.  *See* https://support.apple.com/en-us/HT204505.  For example, the Apple Watch Series 1 has featured Bluetooth protocol 4.0 or 4.2.

73.     The Accused Devices request and receive GPS coordinates from a paired iPhone. The GPS data is used to determine the location of the iPhone.  For example, the Apple Watch

Series 1 connects to an iPhone to get GPS data like distance traveled and pace.

74.     The Accused Devices sold to customers have been delivered with one of Apple's watchOS operating systems pre-installed.  The operating system pre-installed on the Apple Watch Series 1 when offered for sale by Apple at the time this action was filed was Apple's watchOS 4.  The Apple Watch Series 0, when sold with older operating systems installed, may be upgraded to Apple's watchOS 3 or watchOS 4.  The Apple Watch Series 1, when sold with older operating systems installed, may be upgraded to Apple's watchOS 3, watchOS 4, or watchOS 5.

75.     Apple's watchOS 3 was released in or about September 2016.

76.     Apple's watchOS 4 was released in or about September 2017.

77.     Apple's watchOS 5 was released in or about September 2018.

78.     The watchOS 3 operating system includes an Emergency SOS function. Activating the Emergency SOS function causes the Accused Devices to attempt to call emergency services, either via a cellular network if an Apple iPhone is connected and has a cellular signal, or over Wi-Fi if the Accused Devices are connected to a Wi-Fi network.  The watchOS 4 and watchOS 5 operating systems also include the Emergency SOS function.

79.     To determine the emergency number for the user's location, the Accused Devices access a lookup table including one or more location codes and one or more emergency telephone numbers associated with the one or more location codes.  The Accused Devices correlate the location of a paired iPhone with one of the location codes to select one of the emergency telephone numbers.  The Accused Devices then send a command to the Apple iPhone over the Bluetooth connection to call the selected emergency telephone number.

80.     Emergency contacts can be added via the Apple Watch app on an iPhone.  When the Emergency SOS function is activated, the emergency contacts receive a prerecorded text message that includes the location of the Apple Watch.

/ / /

/ / /

**FIRST CAUSE OF ACTION**

**(INFRINGEMENT OF THE '895 PATENT)**

81.    Zomm restates and realleges the allegations set forth in paragraphs 1 through 80 above and incorporates them by reference.

82.    Upon information and belief, Apple has infringed and continues to infringe, either literally or under the doctrine of equivalents, at least Claims 1 and 17 of the '895 Patent in violation of 35 U.S.C. § 271(a) by making, using, offering for sale, or selling within the United States the Accused Devices and/or by importing into the United States the Accused Devices.

83.    Upon information and belief, Apple has also infringed and continues to infringe at least Claims 1 and 17 of the '895 Patent in violation of 35 U.S.C. § 271(b) by inducing vendors, customers and others to make, use, sell, or offer for sale within the United States, products or processes that practice inventions of the '895 Patent with knowledge of and intent that such vendors, customers and others infringe the '895 Patent.  Apple has intentionally caused, urged, encouraged, or aided in the action that induced infringement, including direct infringement, of the '895 Patent by vendors, customers and others.  Upon information and belief, such intentional action includes, for example, inducing customers to infringe the '895 Patent by advertising features of the infringing products that meet the elements of Claims 1 and 17.  As a result of its conduct, Apple has induced and is inducing such vendors, customers and others to make or use systems and methods, such as the Accused Devices, to infringe at least Claims 1 and 17 of the '895 Patent.  Additionally and in the alternative, Apple has induced and is inducing vendors, customers and others to implement and utilize parts of or all of the systems and methods of the Accused Devices to infringe at least Claims 1 and 17 of the '895 Patent.  Apple has engaged and is engaging in this conduct while aware of the '895 Patent and with the intent to infringe, at least as of the filing of this lawsuit.

84.    Claim 1 recites: "[a] wireless security device comprising: a processor; a wireless transceiver; a memory; and computer program instructions stored in the memory, which, when executed by the processor, cause the wireless security device to perform operations . . . ."  Based

on present information, the Accused Devices are wireless security devices that include a processor, a wireless transceiver, and a memory. For example, within the Apple Watch Series 1, the processor and memory are contained in an integrated computer — S1 or S1P System in Package (SiP). Also in the Apple Watch Series 1, an application processor APL0778 is included as the central processing unit (CPU) and a Broadcom WiFi/BT/NFC/FM BCM43342 is included as the transceiver.

85.     Claim 1 further recites: "selecting and implementing a Bluetooth wireless protocol profile from one or more Bluetooth wireless protocol profiles for connecting to one or more Bluetooth enabled devices . . . ." Claim 1 further recites: "wirelessly pairing, via the wireless transceiver over a personal area network, with a Bluetooth enabled telephony device using the selected Bluetooth wireless protocol profile, thus creating a wirelessly paired Bluetooth connection between the wireless security device and the telephony device . . . ." Computer program instructions stored in memory of the Accused Devices, when executed by the processor, cause the Accused Devices to select and implement a Bluetooth wireless protocol profile. Specifically, the Accused Devices implement a Bluetooth Protocol, such as Bluetooth Protocol 4.0 or 4.2, to connect to and wirelessly pair with an Apple iPhone, another Bluetooth enabled device, over the personal area network formed by the Bluetooth connection. According to the Apple.com website, "Apple Watch Series 1 requires an iPhone 5s or later with iOS 11 or later."

86.     Claim 1 further recites: "sending a command to the telephony device requesting one or more of: [1] a telephone number of the telephony device; [2] a telephone network providing service to the telephony device; and [3] a global positioning system (GPS) location of the telephony device; receiving a response from the telephony device including one or more of: [1] the telephone number of the telephony device; [2] the telephone network providing service to the telephony device; and [3] the GPS location of the telephony device; and determining a current location of the telephony device based on one or more of the telephone number, the telephone network, and the GPS location . . . ." Computer program instructions stored in memory, when executed by the processor, cause the Accused Devices to send a command to the

iPhone requesting a telephone number of the iPhone, a telephone network providing service to the iPhone; and/or a GPS location of the iPhone. The Accused Devices then receive a response from the iPhone indicating a telephone number of the iPhone, a telephone network providing service to the iPhone; and/or a GPS location of the iPhone, and uses that information to determine the location of the iPhone. The Accused Devices do not include a GPS sensor. Accordingly, upon information and belief, when using the Emergency SOS option or the built-in Maps application on the Accused Devices, the Accused Devices send a request to the iPhone for GPS data identifying the location of the iPhone. The Accused Devices receive a response from the iPhone that includes the requested GPS data. The Accused Devices then use the GPS data to determine the location of the iPhone.

87. Claim 1 further recites: "accessing a lookup table stored in the memory including one or more location codes and one or more emergency telephone numbers associated with the one or more location codes; correlating the location with at least one of the one or more location codes to obtain at least one of the one or more emergency telephone numbers; [and] sending a command, over the wirelessly paired Bluetooth connection, to the telephony device to place a telephone call to the at least one of the one or more emergency telephone numbers . . . ." Apple's watchOS 3, watchOS 4, and watchOS 5 include an Emergency SOS option that can be swiped after holding the side button, or activated by holding the side button for a particular period of time. Using the Emergency SOS option causes the Accused Devices to attempt to call emergency services, either via a cellular network if an iPhone is connected and has a signal, or over Wi-Fi directly. According to Apple's website, "[w]hen you make a call with SOS, your Apple Watch automatically calls the local emergency number." Upon information and belief, the Accused Devices determine the local emergency number by correlating the location of the iPhone with a location code in a lookup table stored in memory.

88. Claim 1 further recites: "once the telephone call is placed, sending a prerecorded emergency message to the telephony device over the wirelessly paired Bluetooth connection, causing the telephony device to transmit the prerecorded emergency message." Emergency

contacts can be added via the Apple Watch app on an iPhone. According to Apple's website, "[a]fter an emergency call ends, your Apple Watch alerts your emergency contacts with a text message, unless you choose to cancel. Your Apple Watch sends them your current location, and, for a period of time after you enter SOS mode, it sends your emergency contacts updates when your location changes." Because the Accused Devices cannot make cellular calls, when the Accused Devices are not connected to a WiFi network, they must send messages via the paired iPhone.

89. Claim 17 recites the same steps performed by the software recited in Claim 1. Specifically, Claim 17 recites a method comprising:

> [a] selecting and implementing, by a wireless security device, a Bluetooth wireless protocol profile from one or more Bluetooth wireless protocol profiles for connecting to one or more Bluetooth enabled devices;

> [b] wirelessly pairing, via a wireless transceiver of the wireless security device over a personal area network, with a Bluetooth enabled telephony device using the selected Bluetooth wireless protocol profile, thus creating a wirelessly paired Bluetooth connection between the wireless security device and the telephony device;

> [c] sending a command to the telephony device requesting one or more of:

> a telephone number of the telephony device;

> a telephone network providing service to the telephony device; and

> a global positioning system (GPS) location of the telephony device;

> [d] receiving a response from the telephony device including one or more of:

> the telephone number of the telephony device;

> the telephone network providing service to the telephony device; and

> the GPS location of the telephony device; and

> [e] determining a current location of the telephony device based on one or more of

> the telephone number, the telephone network, and the GPS location;

[f] accessing a lookup table stored in the memory including one or more location

codes and one or more emergency telephone numbers associated with the

one or more location codes;

[g] correlating the location with at least one of the one or more location codes to

obtain at least one of the one or more emergency telephone numbers;

[h] sending a command, by the wireless security device, over the wirelessly paired

Bluetooth connection, to the telephony device to place a telephone call to

the at least one of the one or more emergency telephone numbers; and

[i] once the telephone call is placed, sending a prerecorded emergency message

from the wireless security device to the telephony device over the

wirelessly paired Bluetooth connection, causing the telephony device to

transmit the prerecorded emergency message.

90.     Apple's marketing materials, including its website and commercials, intentionally induce consumers to practice each of the steps recited in Claim 17.  Apple advertises that the Accused Devices may be paired to an Apple iPhone according to a Bluetooth wireless protocol profile.  By advertising the built-in Maps application and Emergency SOS option, Apple induces users of the Accused Devices to send a command to the iPhone requesting the GPS location of the paired iPhone, receive in response the GPS location, and determine the location of the paired iPhone based on the GPS location.  Also, by advertising the Emergency SOS option, Apple induces users to cause the Accused Devices to access a lookup table stored in memory, correlate the location of the paired iPhone with a location code stored in the lookup table, obtain an emergency telephone number stored in the lookup table, send a command by Bluetooth to the paired iPhone to place a call to the emergency telephone number, and send a prerecorded emergency message to the iPhone over the Bluetooth connection to be transmitted from the iPhone.

91.     Zomm has been damaged by Apple's infringement of the '895 Patent, has been irreparably harmed by that infringement, and will suffer additional damages and irreparable harm

unless this Court enjoins Apple from further infringement.

92.     Upon information and belief, the infringement of one or more claims of the '895 Patent by Apple has been and continues to be willful and deliberate. As a result, Zomm is entitled to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

**SECOND CAUSE OF ACTION**

**(BREACH OF CONTRACT)**

93.     Zomm restates and realleges the allegations set forth in paragraphs 1 through 92 above and incorporates them by reference.

94.     The Confidentiality Agreement is a valid, binding agreement between Zomm and Apple.

95.     Zomm fully performed under the terms of the Confidentiality Agreement.

96.     The Zomm Source Code Modifications disclosed to Apple, which took Zomm months to create, constitutes Zomm's proprietary information and Confidential Information under the terms of the Confidentiality Agreement. The Zomm Source Code Modifications addressed and improved a number performance parameters of the Wireless Leash Plus, resulting in it being certified as MFi compliant. After five months of continuous efforts by Zomm, Apple also hired from Zomm the lead engineer who developed the Zomm Source Code Modifications.

97.     The proprietary Zomm Source Code Modifications were neither disclosed nor addressed in Zomm's patent, nor could they be determined by reverse engineering. This newly developed code improved performance of the Wireless Leash Plus over Zomm's prior device, the Wireless Leash.

98.     Upon information and belief, Apple has breached the Confidentiality Agreement by using the Zomm Source Code Modifications provided by Zomm to Apple for impermissible purposes, including Apple's own benefit, in direct contravention of the terms of the Agreement.

99.     As a result of Apple's breach of the Confidentiality Agreement, Zomm has lost sales and suffered damages, for which damages Apple is liable.

## PRAYER FOR RELIEF

**WHEREFORE**, Zomm prays for judgment:

A.      that Apple has infringed and is infringing the '895 Patent;

B.      enjoining Apple, its officers, agents, servants, employees, attorneys, successors and assigns and all other persons in active concert or participation with any of them from infringing, and/or inducing infringement of the '895 Patent;

C.      awarding Zomm compensatory damages for Apple's direct and indirect infringement of the patent-in-suit, in an amount to be ascertained at trial, including at least a reasonable royalty and/or Zomm's lost profits, together with interest and costs pursuant to 35 U.S.C. § 284;

D.      trebling the amount of compensatory damages for patent infringement pursuant to 35 U.S.C. § 284;

E.      awarding Zomm damages arising out of Apple's breach of contract and interest thereon;

G.      awarding Zomm reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

H.      granting Zomm such other and further relief in law or in equity as this Court deems just or proper.

## DEMAND FOR JURY TRIAL

Zomm demands a trial by jury on all issues so triable.

DATED: July 17, 2019

Respectfully submitted,

**KELLEY DRYE & WARREN LLP**
Michael J. Zinna (Admitted *Pro Hac Vice*)
John F. Ward (Admitted *Pro Hac Vice*)
David Lindenbaum (Admitted *Pro Hac Vice*)
Andrew W. Homer
Tahir L. Boykins

 /s/ *Michael J. Zinna*
Michael J. Zinna (Admitted *Pro Hac Vice*)

*Attorneys for Plaintiff ZOMM, LLC*

AMENDED COMPLAINT
CASE NO. : 4:18-CV-04969